IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Cathy Sue Dexter,                    :

       Plaintiff,            :

   v.                           :    Case No. 2:13-cv-971

                         :    JUDGE ALGENON L. MARBLEY
Commissioner of Social Security,     Magistrate Judge Kemp

       Defendant.            :


REPORT AND RECOMMENDATION

I.  Introduction

   Plaintiff, Cathy Sue Dexter, filed this action seeking
review of a decision of the Commissioner of Social Security
denying her applications for disability insurance benefits and
supplemental security income.  Those applications were filed on
May 28, 2010, and alleged that Plaintiff became disabled on July
28, 2009.

    After initial administrative denials of her applications,
Plaintiff was given a videoconference hearing before an
Administrative Law Judge on February 2, 2012.  In a decision
dated February 16, 2012, the ALJ denied benefits.  That became
the Commissioner's final decision on July 29, 2013, when the
Appeals Council denied review.

   After Plaintiff filed this case, the Commissioner filed the
administrative record on December 4, 2013.  Plaintiff filed her
statement of specific errors on January 6, 2014, to which the
Commissioner responded on April 11, 2014.  Plaintiff filed a
reply on April 21, 2014, and the case is now ready to decide.

   II.  Plaintiff's Testimony at the Administrative Hearing

   Plaintiff, who was 48 years old at the time of the
administrative hearings and has a ninth grade education,

testified as follows.  Her testimony appears at pages 38-50 of
the administrative record.

Plaintiff's past work included waitressing and bartending.
She was injured in July of 2009.  She worked three days after the
injury but was fired because she could not continue to do her
work duties.  She testified to constant neck pain radiating into
her shoulder, left arm, and hand, and to constant back pain.  She
had been told that she had a herniated disc with muscle spasms,
and that when her muscles relax it causes nerve pain.  The pain
was constant and relieved by medication only if she was not
engaging in any activity.  Standing, sitting, walking, driving,
and moving her back all caused pain.  She used a heating pad for
her shoulder, but it hurt constantly and affected her ability to
lift with her left arm.  She was scheduled to have carpal tunnel
surgery to try to restore some feeling in her left hand.

Plaintiff testified that her neck pain would, without
medication, radiate through her entire body.  She could turn her
head but it was painful to do so.  Holding her head in one
position was also painful.  She was forced to lie down to relieve
the pain, and did so about eighteen hours a day.

During a typical day, if Plaintiff tried to do dishes, she
would experience pain after five or ten minutes.  She also got
headaches.  She would usually lie down when that occurred or, if
not at home, sit down.  Her activities were limited to watching
television, taking care of her mother for several hours (which
involved fixing meals, paying bills, and helping with
medication), and sleeping.  Plaintiff also testified to
experiencing depression.

### III.  The Medical Records

The medical records in this case are found beginning on page
327 of the administrative record.  The pertinent records can be
summarized as follows.

After receiving treatment at the emergency room following the electrocution incident, Plaintiff was treated for, among other things, a cervical herniation with radiculopathy.  After receiving medications and physical therapy under the direction of Dr. Kiger, whose notes appear later in the record, she began seeing Dr. Reddy for her neck and arm pain.  An initial evaluation done on November 23, 2009, revealed some pain during rotation of the left shoulder, although she had a full range of motion.  Imaging showed a narrowing of the disc space at C5-6 as well as a left-sided disc protrusion and some arthritis in the shoulder joint. She had an epidural steroid injection on February 11, 2010. (Tr. 376-80).

Plaintiff underwent a psychological evaluation on August 17, 2010.  At that time, she was living independently with a child and taking care of the day-to-day demands of living.  She had no difficulty reading or writing.  She had never been treated for psychological issues.  She attributed her inability to work to back problems.  She was diagnosed with an adjustment disorder with mixed anxiety and depressed mood and a personality disorder. Her GAF was rated at 54 and she had moderate impairments in her ability to relate to others and to manage daily work stress. (Tr. 389-95).

Ms. Tonkovich, a nurse practitioner, completed a form on May 20, 2010, indicating that Plaintiff suffered from thoracic back pain, chronic headaches, anemia, a racing heart, joint pain, and tooth decay, as well as a mood disorder.  She thought Plaintiff could only sit for two hours in a workday, for 20 minutes at a time, and stand or walk for the same amount of time.  She was also moderately limited in her ability to push, pull, bend, and reach.  (Tr. 396-98).  Dr. Hayes, a psychologist, filled out a mental capacity form on May 24, 2010, showing that Plaintiff had marked limitations in almost every category of functioning and

that she was psychologically unemployable.  (Tr. 399).  That
assessment was accompanied by a report signed jointly by Dr.
Hayes and by Ms. de Lange, a counselor, rating Plaintiff's GAF at
52 and noting that Plaintiff had reported sadness, crying spells,
anhedonia, decreased energy, decreased motivation, decreased
self-esteem, feelings of hopelessness, chronic anxiety, and
short-term memory problems.  (Tr. 400-02).

Plaintiff saw Dr. Cordingley, a neurologist, on August 9,
2011, based on a referral from Dr. Kiger.  Plaintiff reported
that her left hand began to be symptomatic shortly after the
electrocution incident and that it had never improved.  Her left
arm pain had worsened and she still had neck pain and headaches.
She had been taking Percocet and Valium since 2009.  She showed
some difference in perception of touch on the first three digits
of her left hand but no objective neurological deficits.  Dr.
Cordingley recommended an EMG.  That study was performed and
showed severe, distal, left median neuorpathy, which might be
susceptible to improvement with carpal tunnel surgery.  (Tr. 440-
43).

On June 20, 2011, Dr. Kiger completed a document titled
"Multiple Impairment Questionnaire."  In it, she stated she had
treated Plaintiff once every month or two months for almost two
years for her electrocution injury as well as for cervical and
thoracic myofascial pain syndrome and cervical degenerative disc
disease.  Dr. Kiger concluded that Plaintiff would have lifelong
pain and disability, with her pain worsening on activity, and
that the pain was not satisfactorily relieved with medication.
She did believe Plaintiff could sit for eight hours a day and
stand or walk for four hours, and that she could occasionally
lift up to twenty pounds.  She had restrictions on the use of her
left arm and upper back and was precluded from grasping or fine
manipulation with her left hand as well as reaching overhead with

-4-

her left arm.  Plaintiff's symptoms would increase in a
competitive work environment, and she could not constantly hold
her head in one position.  Finally, her pain would frequently
interfere with her attention and concentration, and she would
both need frequent work breaks and would miss work more than
three times per month.  (Tr. 453-60).

IV.  <u>The Vocational Testimony</u>

Patricia Posey, a vocational specialist, was the vocational
expert in this case.  Here testimony begins on page 50 of the
administrative record.

After reviewing Plaintiff's earnings records, Ms. Posey
concluded that Plaintiff did not have any past relevant work that
amounted to substantial gainful activity.  She was then asked
some questions about a hypothetical person who could work at the
light exertional level but was limited in reaching in all
directions with the left arm and could handle on that side only
occasionally.  The person could also climb ramps and stairs
occasionally but could not climb ladders or scaffolds, and could
occasionally balance, stoop, kneel, crouch and crawl.  Further,
the person could do only simple routine and repetitive tasks,
could not perform at a production rate pace, could make only
simple work-related decisions, could interact only occasionally
with supervisors, co-workers and the public, could adapt only to
few, if any, changes in the work setting, and would be off task
for ten percent of the time in addition to scheduled breaks.
According to Ms. Posey, someone with those restrictions could not
perform Plaintiff's prior job as a server, but could be a bakery
worker, night cleaner, or order caller.

Ms. Posey was next asked how the situation would change if
the person were limited to work at the sedentary level.  She said
that the person could do a job like surveillance system monitor,
with 600 such jobs available regionally and 16,500 nationally.

-5-

If, however, the person could not work a full eight-hour day, he or she would not be employable at all.

V.  The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 14-27 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements for disability benefits through March 31, 2014.  Next, Plaintiff had not engaged in substantial gainful activity from July 28, 2009 forward.  As far as Plaintiff's impairments are concerned, the ALJ found that Plaintiff had severe impairments including left shoulder arthritis, degenerative disc disease of the cervical spine, left carpal tunnel syndrome, anxiety disorder, and depressive disorder.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level except she could not climb ladders, ropes or scaffolds, and could only occasionally balance crawl, crouch, stoop, kneel, and climb stairs and ramps.  Further, she could not perform at a production rate pace but could perform goal oriented work.  She could interact only occasionally with supervisors, co-workers, and the public, and would be off task ten percent of the workday in addition to scheduled breaks.  The ALJ found that, with these restrictions, Plaintiff could perform the jobs identified by Ms. Posey  - specifically food product inspector, night cleaner, and order caller - and that such jobs existed in significant numbers in the regional and state economies.  Consequently, the ALJ

-6-

concluded that Plaintiff was not entitled to benefits.

VI. <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ did not properly weigh the opinion evidence; and (2) the ALJ did not make a proper credibility finding. The Court analyzes these claims under the following standard.

<u>Standard of Review.</u> Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" <u>Id</u>. <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439–440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

A. <u>The Opinion Evidence</u>

Plaintiff criticizes the ALJ's discussion and analysis of

-7-

the opinion evidence, including the reports from Dr. Kiger and Ms. Tonkovich, as being "so vague as to preclude effective judicial review." Statement of Errors, Doc. 8, at 9. In particular, she faults the ALJ for relying on inconsistencies between Dr. Kiger's opinions and other evidence of record, but failing to specify what those inconsistencies were. She also argues that Dr. Kiger's opinions were fully consistent with the record, were not contradicted by any other medical evidence, and should have been given controlling weight. Alternatively, she contends that great weight should have been afforded to Dr. Kiger's views. Additionally, she takes issue with the ALJ's reasons for giving no weight to Ms. Tonkovich's assessment of Plaintiff's ability to perform work-related functions, and asserts that his RFC finding was not supported by the record.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. §404.1527(d); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994). No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation

-8-

so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

Here, the ALJ first addressed, at Tr. 23, a statement made in Dr. Kiger's treatment notes, see Tr. 414, about Plaintiff's being "unable to work due to pain," but it is not clear if that is Dr. Kiger's opinion or Plaintiff's report of her situation, so that part of the analysis does not seem to be at issue. Next, the ALJ discussed the Multiple Impairment Questionnaire, and, after describing the views Dr. Kiger expressed in detail, had this to say about how much weight it was given:

> The undersigned accords great weight to the portion ...
> regarding the claimant's ability to lift up to 20
> pounds as it is consistent with the medical record of
> evidence and supported by Dr. Kiger's treatment record.
> However, the undersigned accords no weight to the rest
> of her opinion, as it is inconsistent with medical
> record of evidence and unsupported by Dr. Kiger's own
> treatment record. Such activities are inconsistent
> with the limitations described by Dr. Kiger, as well as
> the claimant's own admissions.

Tr. 24. The ALJ similarly afforded no weight to Ms. Tonkovich's views because "they are on issues reserved to the Commissioner and not opinions on the nature and severity of the claimant's impairment" and because it was possible that Ms. Tonkovich was simply stating that Plaintiff could not do her past work. Id. No weight was given to the state agency reviewers' opinions, either.

It is apparent that the quoted language does not comply with the articulation requirement set forth in 20 C.F.R. §404.1527(c) or the controlling Sixth Circuit case law. The generalized reference to the "medical record of evidence," without any explanation of what portions of that record are being relied on,

or to Plaintiff's "admissions" - which, given her testimony,
appear to be totally inconsistent with being able to work an
eight-hour day - without suggesting what Plaintiff admitted to,
are simply insufficient.  This language from <u>Johnson v. Comm'r of
Social Security</u>, 2013 WL 6062147, *6 (S.D. Ohio Nov. 18, 2013),
illustrates the point:

> As <u>Wilson</u> noted, SSR 96-2p sets out that
> [articulation] requirement clearly, stating that the
> ALJ's decision "must contain specific reasons for the
> weight given to the treating source's medical opinion,
> supported by the evidence in the case record, and must
> be sufficiently specific to make clear to any
> subsequent reviewers the weight the adjudicator gave to
> the treating source's medical opinion and the reasons
> for that weight." <u>Id</u>. at 544.  The ALJ's vague
> reference to the "longitudinal medical treatment,"
> without more, gives no guidance to this Court about
> what portion of that treatment the ALJ found to be
> inconsistent with [the treating source's] opinion, nor
> even what records created by which physicians contain
> that information.

In her memorandum, the Commissioner insists that the ALJ met
the articulation requirement because, when he referred to the
"medical record of evidence," he was invoking his prior
discussion of Dr. Reddy's and Dr. Kiger's treatment notes.  That
cannot provide the needed explanation, however.  Almost every ALJ
opinion contains a narrative description of the evidence.  If,
when engaging in the specific task of reviewing the treating
source opinions, an ALJ were permitted to make a general citation
to the "evidence," and then have the Court construe that to mean
the ALJ's prior, non-analytical summary, the problem of
determining what portion of that evidence the ALJ deemed to be
inconsistent or non-supportive remains.  The Commissioner
speculates that the ALJ meant to refer to Dr. Reddy's
observations about a full range of motion (although Dr. Reddy
noted that shoulder motion caused pain, a fact mentioned by the
ALJ but not recited in the Commissioner's summary of that

-10-

evidence) and one isolated statement from Dr. Kiger's copious treatment notes to the effect that Plaintiff responded well to medication when her dosage was increased.  Although the Commissioner states that this was the evidence the ALJ relied on, there is no way to know that.

The same is true with the ALJ's reference to Plaintiff's "admissions."  Even though he noted that some of her activities, such as mowing the lawn, doing chores, or caring for her mother, were not necessarily consistent with total disability, her testimony as a whole was to the contrary.  The ALJ did find her not wholly credible, but that is a different matter than concluding she "admitted" - without more specificity as to what she said or where she said it - to being able to do activities consistent with full-time employment. But even if his discussion on this point is adequate, it still does not cure the problem with his generalized reference to the medical record.

Additionally, there is substantial merit in Plaintiff's argument that the medical evidence actually supports, rather than contradicts, Dr. Kiger's opinions.  Dr. Kiger fits the classic description of a long-time treating source, having examined Plaintiff on multiple occasions over a two-year period of time, conducting tests, sending Plaintiff to multiple specialists, and ultimately crediting Plaintiff's report that her pain, especially when being active, was debilitating.  Moreover, Dr. Kiger did not simply state that Plaintiff was disabled; she provided a very detailed description of her limitations, only two of which the ALJ accepted.  It is not clear what other evidence supported the rejection of, for example, limitations on grasping or manipulation, on changing position frequently, of pain interfering with attention and concentration, or of having enough bad days to miss an excessive amount of work.  No other treating or examining source contradicted those findings, but the ALJ simply rejected them wholesale.  Even if some other evidence was

-11-

inconsistent with some of these findings, the ALJ provided no
clear explanation for his conclusion that they were all entitled
to no weight.  And the consistent evidence - for example, that
provided by Ms. Tonkovich - was rejected for improper reasons,
such as the ALJ's speculation that Ms. Tonkovich was unaware of
the legal definition of disability or made determinations
reserved to the Commissioner.  In fact, as Plaintiff points out,
she expressed an opinion as to specific physical limitations,
which is neither a matter reserved to the Commissioner, see 20
C.F.R. §404.1527(a)(2), nor a matter dependent on how the SSA
defines disability.  Therefore, the Commissioner's decision to
disregard every limitation imposed by Dr. Kiger except for the
ones consistent with the ability to perform light work activity
is neither properly articulated nor supported by the record.
That conclusion eliminates the need to determine if there was
substantial support for the Commissioner's RFC finding; a new
finding of Plaintiff's residual functional capacity will have to
be made after the case is remanded and Dr. Kiger's opinion is
evaluated in accordance with the controlling regulation and case
law.

                    B.  Credibility

     Plaintiff's only other argument is that the ALJ did not
properly evaluate her credibility.  She bases this contention on
the fact that the ALJ, in her view, utilized an incorrect
standard for determining if her testimony was credible -
comparing it to the other evidence of record and not to the ALJ's
residual functional capacity finding - and the ALJ's reliance on
evidence that, in fact, was not inconsistent with her description
of the severity of her symptoms.

     To the extent that Plaintiff relies on decisions such as
Bjornson v. Astrue, 671 F.3d 640 (7th Cir. 2012), in support of
her argument, this Court has not accepted the premise of that
decision - that simply by rejecting a claimant's testimony as

                            -12-

inconsistent with the RFC determined by the ALJ, the ALJ has irretrievably tainted the decision-making process.  See, e.g., Ritterbeck v. Commissioner of Social Sec., 2012 WL 6594828, *6 (S.D. Ohio Dec. 18, 2012), adopted and affirmed 2013 WL 796069 (S.D. Ohio March 4, 2013), noting that "when an ALJ, despite using the standard template, engages in a complete discussion of the credibility issue, the Court will simply review that determination to insure that it is supported by substantial evidence."  That is what the Court will do here as well.

     As to the second question - the existence of substantial evidence to support the ALJ's credibility determination - the ALJ did explain, in sufficient detail, why he found Plaintiff less than fully credible.  However, there are flaws in that analysis.  For example, relying on a statement by Dr. Reddy that Plaintiff was "expected to improve" with treatment is problematic; it is not his expectation, but what actually occurred, which is significant.  The objective medical evidence, in terms of the course of treatment, is relevant, however, and can be an indication of the severity or lack of severity of a claimant's condition - although where, as here, the issue is the extent of the pain caused by those conditions, the objective evidence is not entirely determinative.  As noted in Swain v. Comm'r of Social Security, 297 F.Supp. 2d 986, 989 (N.D. Ohio 2003), "[t]he determination of whether the condition is so severe that the alleged pain is reasonably expected to occur hinges on the assessment of the condition by medical professionals."  Here, the only treating or examining professionals who actually assessed Plaintiff's pain and its impact on her ability to function in the workplace were Dr. Kiger and Ms. Tonkovich, and, as the Court has determined, the ALJ improperly rejected most of their views.  Other sources, including Dr. Reddy and Dr. Cordingley, did not evaluate that issue.  It is therefore problematic for the ALJ to have relied on their findings when they did not address the key

-13-

issue of the extent to which Plaintiff actually suffered from
pain that limited her abilities in the ways described by Dr.
Kiger and Ms. Tonkovich.  In any event, on remand, after the ALJ
performs a proper evaluation of the opinion evidence and the
extent to which it is either consistent or inconsistent with
Plaintiff's self-report of symptoms, he will be in a better
position to make a proper credibility determination.

VII.  <u>Recommended Decision</u>

Based on the above discussion, it is recommended that the
Plaintiff's statement of errors be sustained to the extent that
this case be remanded to the Commissioner for further proceedings
pursuant to 42 U.S.C. §405(g), sentence four.

VIII.  <u>Procedure on Objections</u>

If any party objects to this Report and Recommendation,
that party may, within fourteen (14) days of the date of this
Report, file and serve on all parties written objections to those
specific proposed findings or recommendations to which objection
is made, together with supporting authority for the objection(s).
A judge of this Court shall make a <u>de novo</u> determination of those
portions  of the report or specified proposed findings or
recommendations to which objection is made.  Upon proper
objections, a judge of this Court may accept, reject, or modify,
in whole or in part, the findings or recommendations made herein,
may receive further evidence or may recommit this matter to the
magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to
object to the Report and Recommendation will result in a
waiver of the right to have the district judge review the
Report and Recommendation <u>de novo</u>, and also operates as a
waiver of the right to appeal the decision of the District
Court adopting the Report and Recommendation.  <u>See Thomas v.
Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d
947 (6th Cir. 1981).

-14-

/s/ Terence P. Kemp
United States Magistrate Judge